**IN THE SUPREME COURT OF MISSISSIPPI**
**NO. 2000-CA-00714-SCT**

*TODD W. DUNN*

*v.*

*JUDY H. DUNN*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/20/2000 |
| TRIAL JUDGE: | HON. DOROTHY WINSTON COLOM |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | DAVID MICHAEL BRISOLARA |
| ATTORNEY FOR APPELLEE: | DOLTON W. McALPIN |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | AFFIRMED IN PART AND REVERSED AND RENDERED IN PART - 05/24/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 6/14/2001 |

**BEFORE McRAE, P.J., DIAZ AND EASLEY, JJ.**

**EASLEY, JUSTICE, FOR THE COURT:**

¶1. Todd W. Dunn ("Todd") appeals this case from the Chancery Court of Oktibbeha County. The case sub judice involves the reformation of a warranty deed. On September 24, 1999, Judy H. Dunn ("Judy"), Todd's mother, filed her Complaint for Reformation of Warranty Deed and Other Relief. Judy sought to have two of three tracts of land removed from her warranty deed made to Todd on September 25, 1998. The complaint also sought to temporarily and permanently enjoin Todd from taking steps to remove Judy from the house. Judy filed a Motion for Temporary Relief on October 7, 1999. On October 12, 1999, Todd filed his Affirmative Defenses, Answers and Counter-Complaint. Judy filed her Answer to the Counter-Complaint on October 19, 1999. Todd filed his Response to Plaintiff's Motion for Temporary Relief on October 28, 1999.

¶2. On November 8, 1999, the chancellor held a hearing on temporary relief. On November 22, 1999, the chancellor signed an order granting Judy exclusive possession and use and occupancy of the residence during the pendency of the action and immediate possession of her personal items. The chancellor also allowed the complaint to be amended to add Merchants and Farmers Bank as a party defendant to the action. Merchants and Farmers Bank filed its answer to the Complaint for Reformation of Warranty Deed and Other Relief on January 31, 2000.

¶3. The court on February 16, 2000, held the final hearing in this matter. The court on April 3, 2000, issued

its opinion and instructed the Plaintiff to prepare the order. On April 20, 2000, the court entered its judgment reforming the deed in favor of Judy and denying Todd's counterclaims. On April 21, 2000, Todd filed a Motion for Reconsideration, Suggestion of Error and Request for Stay of Execution with the lower court. The court on April 21, 2000, denied the motion.

¶4. On April 26, 2000, Todd's attorney filed a notice of appeal to this Court from the final judgment and the denial of the Motion for Reconsideration, Suggestion of Error and Request for Stay of Execution. On May 17, 2000, then Chief Justice Lenore L. Prather ordered the Chancery Court of Oktibbeha County to submit findings of fact in denying the emergency stay. On June 8, 2000, having received the chancellor's findings of fact, then Presiding Justice Edwin Lloyd Pittman likewise denied the motion for emergency stay of execution.

¶5. It is from this denial of the motion for emergency stay of execution and from the final judgment the trial court that Todd now appeals to this Court.

## FACTS

¶6. Judy owned three tracts of real property, consisting of 40 acres with a house, 59.4 acres of pasture land and an easement. It should be noted for clarification purposes that at different points in the transcript of the hearing, the 59.4 acres are also described as 60 acres, but it is the same property. Todd is Judy's son. Judy had lost her long-held employment at Mississippi State University. She had been absent from work for 37 ½ days. She had been passing bad checks. Judy had gotten behind on the payments on the house and 40 acres and the other 59.4 acres as well. Both properties, the 40 acres with the house and the 59.4 acres, were secured by two different lenders. A foreclosure notice on the house and 40 acres ran in the newspaper. At this point, Judy's family discovered her financial condition. Barbara Dunn Rogers, Judy's sister-in-law, sister of her deceased husband and wife of attorney Russ Rogers, called Judy about the foreclosure notice that she saw in the newspaper.

¶7. Attorney Russ Rogers, Judy's brother-in-law and Todd's uncle, prepared the warranty deed conveying all three tracts of land from Judy to Todd. Rogers stated that he was only trying to help out his family. Rogers's secretary, Judy Black, was the person who had typed the warranty deed in 1998. Black testified that she notarized Judy's signature after Judy read and signed the deed in front of her in her office. Black also testified that Judy asked about the house not being listed in the deed. Black testified that she explained to Judy that the warranty deed listed the 40 acres and that since the house sat on the 40 acres that the deed covered everything.

¶8. Jim Cook, senior lending officer at Merchants and Farmers, handled two loans involving the 40 acres and the 59.4 acres properties, in September 1998 and January 1999. Cook testified that due to the timing of the pending foreclosure that there was not much time to handle the transactions on the property. Cook stated that it was his understanding all along that Todd would be borrowing sufficient funds to cover all the obligations to the mortgage companies on both the 40 acres and 59.4 acres, and he would then in return put up the 40 acres and 59.4 acres properties as collateral on the loan from Merchants and Farmers. Cook testified that Judy seemed to understand everything that was going on the day she came in the bank. Judy did not ask Cook any questions and signed the note.

¶9. Judy deeded all three tracts to Todd. Judy borrowed $24,820.79 in September 1998, to pay off the mortgage on the 59.4 acres of $16,000.00, to stop the impending foreclosure on the house and 40 acres of

$6,823.41 and $1,753.46 to cover a small personal loan. Todd used the property to secure a note for $65,000.00 in January 1999, from Merchants and Farmers to pay off the original mortgage of $34,396.70 on the house and 40 acres with First Nationwide Mortgage Company, $24,820.79 to pay off the loan Judy made in 1998 with Merchants and Farmers, and $5,782.51 to use for repairs to the house.

## DISCUSSION

### I. Did the Court err in its additional findings of facts submitted to the Mississippi Supreme Court in support of the Court's denial of the Defendant's Motion for Stay of Execution?

¶10. Todd raises the issue on appeal that the chancellor erred in the additional findings of fact that were supplied to this Court. On April 21, 2000, Todd's attorney filed a Motion for Reconsideration, Suggestion of Error and Request for Stay of Execution. The chancellor on or about April 21, 2000, denied the Motion for Stay of Execution. Todd appealed the denial of the stay of execution on April 26, 2000, to this Court. On May 17, 2000, then Chief Justice Lenore L. Prather ordered that the Chancery Court of Oktibbeha County had fifteen (15) days from entry of its order to provide this Court with its findings of fact concerning the irreparable and disproportionate harm which will occur to Judy W. Dunn and Merchants and Farmers Bank if the stay were granted. The chancellor supplied her findings to this Court. On June 8, 2000, then Presiding Justice Edwin Lloyd Pittman, ordered that Todd's Emergency Motion for Stay be denied.

¶11. Todd untimely raised this issue. Todd raised on appeal other issues from the final hearing that dealt with the reformation of the warranty deed. Any decision of this Court as to the other issues surrounding the reformation of the warranty deed raised within this same appeal would render the emergency stay of execution moot by the time this Court decided the reformation issues. This issue as to the emergency stay of execution which was decided by this Court on June 8, 2000, is moot.

### II. Did the Court commit reversible error in reforming the warranty deed based upon a finding of mistake on the part of the Plaintiff?

¶12. This Court has repeatedly stated that it will examine the record and accept the evidence reasonably tending to support the findings made below, along with all reasonable inferences which may be drawn therefrom which favor the trial court's finding of fact. *In re Estate of Taylor*, 609 So.2d 390, 393 (Miss. 1992). The chancery court as trier of fact has the primary authority and responsibility to assess the credibility of witnesses. *Bryan v. Holzer*, 589 So.2d 648, 659 (Miss. 1991). In *Hill v. Southeastern Floor Covering Co.,* 596 So.2d 874, 877 (Miss. 1992), this Court stated that the chancellor's findings will be upheld unless those findings are clearly erroneous or an erroneous legal standard was applied.

¶13. Todd claims that the trial court erred in finding that the warranty deed in question should be reformed based upon a mistake by Judy. We agree.

¶14. The standard of proof in reforming a deed is beyond a reasonable doubt. This Court has stated that "[t]he law in Mississippi is clear that, to prove a mistake in a warranty deed, the party alleging the mistake, and seeking to reform the deed because of it, must prove the mistake **beyond a reasonable doubt**." *McCoy v. McCoy*, 611 So.2d 957, 961 (Miss. 1992) (citing *Webb v. Brown*, 404 So.2d 1029, 1032 (Miss. 1981)) (emphasis added). The evidence presented to justify reformation of a deed must be sustained by proof beyond a reasonable doubt. *Brown v. King*, 214 Miss. 437, 439, 58 So.2d 922, 923 (1952).

¶15. Judy testified that in 1998 she had gotten behind on the payments on the house and the other 59.4

acres. The house on the 40 acres and the other 59.4 acres both had mortgages, but the mortgages were with different lenders. Judy testified that Deposit Guaranty National Bank held the trust deed on the 59.4 acres back 1998. She could not remember who held the trust deed on the house and 40 acres. The mortgage on the house and 40 acres was with First Nationwide Mortgage Company. Judy testified that she learned of the foreclosure notice running in the newspaper from her sister-in-law, Barbara Dunn Rogers, sister of Judy's deceased husband, Buddy Dunn.

¶16. She testified that she finally discussed her financial condition with her son, Todd, and they then came to an agreement on how to stop the foreclosure. Judy testified that she did not agree to deed Todd her house. She left everything up to Todd to arrange. Judy was asked on cross-examination whether she considered herself incompetent. She testified that she did not consider herself incompetent nor had she ever pled herself to be incompetent.

¶17. Judy claims that she never read the deed or the paperwork at the bank. The law in Mississippi is clear that "a person cannot avoid a written contract which he entered into on the ground that he did not read it or have it read to him, and that he supposed the terms were different, unless he was induced not to read it or have it read by fraudulent representation made to him by the other party on which he was entitled to rely." *McCubbins v. Morgan*, 199 Miss. 153, 159, 23 So.2d 926, 927 (1945). A grantor cannot obtain relief against a conveyance made merely on the ground that the grantor did not read the deed nor have the contents of the deed explained to him. *Id*. Judy's testimony that she did not read the deed or understand the conveyance, was the only evidence presented by Judy which supported her allegations. The trial court received testimony from Jim Cook, senior lending officer at Merchants and Farmers, and Judy Black, secretary for attorney Russ Rogers, that contradicted Judy's position. In *United States v. Williams*, 441 F.2d 637, 645 (5th Cir. 1971), the Fifth Circuit stated as follows:

> Equity will not reform a written contract because of mistake as to the contents of the writing on the part of the complaining party, who is able to read but negligently fails to do so, unless there is a mutual mistake of fact.

In that case, Williams had received a sketch of the property that with very little effort would have allowed him to have discovered the true boundary of the property. Williams apparently did not review the sketch. Because of his own negligence, Williams signed the deed under a mistake of fact that he had regarding the property. Williams claimed that the engineers did not inform him of the boundary. The court held that there was no mutual mistake; and therefore, Williams was not entitled to reformation of the deed.

¶18. In the case sub judice, Russ Rogers, Todd's uncle and husband to Barbara Dunn Rogers, was the attorney who drew up the deed. Russ Rogers drafted a deed that conveyed all three tracts from Judy to Todd. Tract I was the 40 acres with the house, Tract II was the other 59.4 acres and Tract III was the easement. All three tracts were clearly listed in one warranty deed. The tract that involved the house and 40 acres was listed first on the deed.

¶19. Jim Cook, senior lending officer at Merchants and Farmers Bank, handled the financing. Merchants and Farmers made two separate loans with respect to the 40 acres and the 59.4 acres. The first loan was made in September 1998, to Judy Dunn for $24,576.87. According to Cook, the loan to Judy for $24,576.87 was paid out as follows: $1,753.46 to cover a small loan Judy already had with Merchants and Farmers, $16,000.00 to Deposit Guaranty to pay off the mortgage on the 59.4 acres, and $6,823.41 to Arnold Wise, the attorney for the mortgage company to stop the impending foreclosure on the house and

40 acres. The second loan made by Merchants and Farmers Bank was made to Todd Dunn for $65,130.00, $65,000.00 in principal and $130.00 in fees. Todd executed a deed of trust dated January 28, 1999, on the house and 40 acres and the 59.4 acres. Cook testified that the $65,000.00 was paid out as follows: $34,396.70 was paid to First Nationwide Mortgage Company to pay off the mortgage on the house and 40 acres, $24,820.79 was paid to Merchants and Farmers Bank to pay off the loan made by Judy in September 1998, and $5,782.51 was paid to Todd to use for repairs to the house.

¶20. Cook was questioned as to the basis of his decision to lend money to Judy and Todd. Cook testified that he had an understanding that Todd was going to refinance the loan made to Judy and that Todd would put up the 40 acres and the 59.4 acres as collateral to secure his note. Cook testified as follows:

> Q: Mr. Cook, would you have made the same loan that you made for Todd and for which Todd issued a deed of trust to your bank for Judy Dunn?
>
> A: Would I have made this September of 1998 loan, is that the question? Or the last loan I made to Todd for $65,000.00?
>
> Q: Either one.
>
> A: I would not have made the $65,000.00 and I would not have made the first one had I not had an understanding that it would be refinanced and paid off by Todd.
>
> Q: So basically Todd would have been the reason that the loan would have been made?
>
> A: From a credit stand point, yes.

¶21. Cook testified concerning Judy's demeanor that day at the bank and whether she seemed to understand the transaction. He testified that, in his opinion, Judy did understand the transaction. Cook testified that Judy just signed the note, a deed of trust and a few things and then just said thanks. According to Cook, Judy did not ask any questions. There was no proof that Judy had any reason not to read the paperwork at the bank or was prevented from reading the paperwork.

¶22. Judy Black, secretary for attorney Russ Rogers, prepared the deed for the conveyance between Judy and Todd in 1998. Black stated that Judy came into her office, and she gave Judy the deed. Black testified that Judy read the deed. She testified that Judy specifically asked her why the deed did not say anything about the house. Black explained to Judy that, by listing the 40 acres that the house sat on within the deed, the deed covered everything. After Judy read the deed, she signed the deed, and Black notarized her signature.

¶23. The testimony by Black and Cook both contradict Judy's position that she mistakenly deeded the house and 40 acres to Todd. In fact, Judy's own testimony was that she was not incompetent nor was she alleging that she was incompetent. No evidence was presented that Judy was in any way impaired or unable to read or understand what she read. Judy read the deed or at least had the opportunity to read the deed. The trial court erred in finding that the deed in question should be reformed based upon a mistake by Judy. Judy did not satisfy the standard of proof to reform a deed beyond a reasonable doubt. The evidence presented by Judy consisting of her testimony alone did not prove beyond a reasonable doubt that the deed should have been reformed. All other evidence pointed toward the contrary. The chancellor's decision was clearly erroneous and is reversed.

**III. Did the Court err as a matter of law in finding that the Defendant had a confidential relationship with the Plaintiff?**

¶24. The chancellor in the case sub judice defined a confidential relationship by quoting *Madden v. Rhodes*, 626 So.2d 608, 617 (Miss. 1993)(citing *Hendricks v. James*, 421 So.2d 1031, 1041 (Miss. 1982)), as follows:

> Whenever there is a relationship between two people in which one person is in a position to exercise dominant influence upon the other because of the latter's dependency upon the former, arising either from weakness of mind or body, or through trust, the law does not hesitate to characterize such a relationship as fiduciary in character.

The chancellor also noted that in *Lowery v. Guaranty Bank & Trust Co.*, 592 So.2d 79, 83 (Miss. 1991), this Court stated:

> A fiduciary relationship may arise in a legal, moral, domestic or personal context, where there appears "on the one side an overmastering influence or, on the other, weakness, dependence, or trust, justifiably reposed." Additionally a confidential relationship, which imposes a duty similar to a fiduciary relationship, may arise when one party justifiably imposes a special trust or confidence in another, so that the first party realizes the care and vigilance that he normally would exercise on entering into a transaction with a stranger.

¶25. The chancellor stated that Todd was in a confidential relationship with Judy and used that position to his benefit. The testimony of Judy Black, the secretary who prepared the warranty deed, was that Judy read the deed before signing it and even asked a question regarding the deed. Judy specifically asked Black about the house. Judy had gotten substantially behind on the notes of both properties, the 40 acres with the house and the 59.4 acres. She had not made any attempt to pay these mortgages. Russ Rogers, the attorney who prepared the deed in question, was a relative of Judy. Rogers testified that he had offered his services at no charge "to help my family - my nephew and sister-in-law." Rogers testified that at no point did anyone ever tell him that the house was not to be included in the deed. Rogers stated that his understanding was that all the property was to be included in the deed. Todd had arranged for Rogers to prepare the deed, but Judy came to Rogers's office and read and signed the deed.

¶26. Testimony was presented from Hayes Hunt, Judy's brother, that he had advised Judy before anything was signed that she could bring everything to him for review before signing. Obviously, Hunt had stressed to Judy to review what she signed before signing. Judy never carried the deed to Hunt to review.

¶27. Judy had allowed the mortgages on both properties to become delinquent. However, she made no attempt to prevent the inevitable consequence of the foreclosure of both properties. She exhibited a total disregard for the consequences. According to only Judy's testimony, she alleged that she did not know that she conveyed the house and 40 acres to Todd, and she believed that Todd had just paid the mortgage up to date. However, according Judy's own testimony, she did **not** make any payments at all on the mortgage for the months of October, November and December, even though, she alleged that she believed that her mortgage still existed after the September 1998 transaction. Clearly, Judy was not concerned about making any mortgage payments at all since she made no payments. Without Todd stepping in and covering both mortgages, the 40 acres with the house and the 59.4 acres would have been lost in foreclosure and sold to strangers to cover the debt. The fact that Judy did not make any effort to continue paying any mortgage

payments after the transaction on the house and 40 acres is strong evidence against Judy's claim that she was to keep the 40 acres with the house and that Todd was only to catch up the debt for her.

¶28. Jim Cook, the banker at Merchants and Farmers, testified that he knew of the impending foreclosure and the lack of time to do any appraisals as a basis upon which to lend the money. Judy did not seek any help from the family until her sister-in-law noticed the foreclosure running in the newspaper. Judy obviously could have taken action before this point. Hunt testified that he offered to help his sister, Judy, out of the financial condition. Judy never sought Hunt's help, and Hunt provided no financial help.

¶29. Neither Cook nor Black testified that anything from Judy's demeanor indicated that she was being taken advantage of in this transaction. Judy's own daughter, Carrie Dunn, testified as follows regarding her knowledge of the transaction when questioned by Todd's attorney:

> Q. Now, Carrie, I know that you know why we're here today. Do you have any knowledge about the transaction between your mother and Todd involving avoiding some foreclosures?
>
> A. Yes, sir.
>
> Q. Okay. Would you tell the Court what you know about that?
>
> A. Okay. My mom was about to lose the house and she - it had been ran in the paper like two or three times and I had asked her about it. And she said that she was trying to get back at Beverly and Bill for some reason. But anyway, she just about lost the house and Todd had talked to her and he had asked her did she need any money or anything and she kept telling him 'no'. Well, ah, later on, we come to find out that it was fixing to be foreclosed like the next day. So, Todd told her that if he wanted to - that if she wanted him to, that he would - she could deed the land to Todd and he would pay the house payments and everything and it would be the land and the house and the 60 acres. So, she did that because, I mean, she was fixing to lose it. She didn't even care about it.
>
> Q. She told you that she didn't care?
>
> A. Uh huh. She said that - I mean, she didn't even want to go there, she didn't care, she had given up. I mean, she was just sick of everything, is what she said.

¶30. In determining whether a fiduciary relationship exists, we have to look to see if one person depends upon another. *In re Will & Estate of Varvaris*, 477 So.2d 273, 278 (Miss. 1985). A confidential relationship arises when a "dominant overmastering influence controls" a dependent person. *Murray v. Laird*, 446 So.2d 575, 578 (Miss. 1984). In *Thomas v. Jolly*, 251 Miss. 448, 454, 170 So.2d 16, 19 (1964), this Court stated,

> a deed from a parent to a child alone and of itself raises no presumption of undue influence since, in the absence of evidence to the contrary, the parent is presumably the dominant party. This is true even though the parent is aged, or aged and infirm.

Even if a presumption of undue influence existed due to a confidential relationship, that presumption can be rebutted by a showing of clear and convincing evidence to the contrary. *Miner v. Bertasi*, 530 So.2d 168, 172 (Miss. 1988).

¶31. While there is no dispute that there exists a family relationship between Todd and Judy, it is clear from the record as a whole that Todd stepped in to save the property from foreclosure, not to take advantage of Judy. Judy had let things go to the point that the choices were limited. Judy was the only witness who supported her claim. Carrie Dunn, Judy's daughter, testified that Judy had refused any help prior to foreclosure. No witness, when questioned, testified that Todd had any history of deceptive acts or practices. In fact, no other witnesses' testimony supported the claims made by Judy. While related to Judy, Todd did not use his relationship to take advantage of her. The chancellor erred in finding that a confidential relationship existed and that the confidential relationship was used to the benefit of Todd at Judy's detriment. The evidence shows that Judy had intended to try to get away with never having to pay anything to live in the house, either in rent or mortgage payments.

### IV. Did the Court err in denying Todd the relief sought in his Counter Complaint?

¶32. Todd claimed in his counterclaim that he was entitled to (1) reimbursement of the costs of cleaning up Judy's house, (2) damages for various acts of vandalism, (3) damages for infliction of emotional distress, (4) rent and double-rent, and (5) attorney's fees. On appeal, Todd briefly raises only the issues of rent and double-rent, costs of repair and the attorney's fees. Therefore, the other issues not raised or addressed on this appeal are hereby deemed waived.

¶33. Todd cites Miss. Code Ann. § 89-7-25 (1999), stating that a tenant failing or refusing to quit the premises is liable for double rents from the date of the notice by the landlord to vacate the premises. On February 22, 1999, Judy was mailed a letter of eviction from Todd Dunn and Carrie Dunn. A final judgment of eviction was taken in Oktibbeha County Justice Court on March 24, 1999. Todd claims that he is entitled to $14,800.00 as back rent.

¶34. Todd and his wife, Melissa Dunn, both testified that Judy agreed to pay $500.00 per month rent. Todd claimed that Judy paid him $200.00 in November 1998 for rent. However, Judy claimed the payment for $200.00 consisted of two $100.00 bills to give Carrie, her daughter, to use to buy clothes. Judy never testified that she was paying rent to Todd. There was no written agreement setting out the terms of any rental agreement.

¶35. Judy's testimony at the final hearing was that she was not living in the house and had not moved into the house since the temporary hearing. All of the evidence presented by Todd regarding the condition of the house indicates that the home was uninhabitable. There was no testimony which clearly indicated what period of time that Judy lived in the home to justify the calculated amount of rent and double rent demanded by Todd. All that is clear from the record is that since the temporary hearing, where Judy was awarded temporary use and possession of the home, Judy never returned to the home to live.

¶36. Todd also claims that Judy should pay him $3,000.00 for damages to the house. Todd did not submit to the trial court any estimate of repairs or statements for repairs made to justify the $3,000.00 figure. All that was presented to the court placing a monetary amount at all on any damage was Todd's testimony of a broken window that would cost between $100.00 and $200.00 to replace and a commode that would cost $140.00 to replace.

¶37. By their testimony, Todd, his wife, Melissa Dunn, and his sister, Carrie Dunn, stated that they did not damage the house. Todd alleges that Judy was responsible for the damage. Judy denied that she damaged the house in any way and that she did not know anything about any damage to the house because she had

not been there. Todd did not present any proof that Judy was in any way responsible for the damage done to the house. All that was presented by Todd was proof that he did not do the damage. Therefore, there was no evidence presented to substantiate Todd's claim for damages to the house.

¶38. Finally, Todd asserts that Judy should pay his attorney's fees in the amount of $3,000.00. Todd's contract for the bill with his attorney was introduced to the court. The chancellor properly denied Todd's request for attorney fees from Judy. Absent statutory authority or contractual provisions, attorneys' fees cannot be awarded unless punitive damages are also proper. *Cenac v. Murray*, 609 So.2d 1257, 1274 (Miss. 1992); *Defenbaugh & Co. of Leland Inc. v. Rogers ex rel. Thompson*, 543 So.2d 1164, 1167 (Miss. 1989). There is no statutory authority or contractual provision presented to support attorneys' fees being granted nor were punitive damages proper under the facts of the case sub judice.

¶39. The chancellor properly denied Todd's counterclaims.

## CONCLUSION

¶40. The decision of the lower court is reversed in part and affirmed in part. The evidence presented does not substantiate the chancellor's decision to reform the deed.

¶41. The decision to reform the deed is reversed and rendered. Todd's counterclaims are unsupported by the evidence presented and were properly denied by the chancellor. The decision to deny Todd's counterclaims is affirmed.

¶42. For these reasons, the judgment of the Oktibbeha County Chancery Court is reversed to the extent that it reformed the warranty deed from Judy H. Dunn to Todd W. Dunn, and judgment is rendered here for Todd dismissing Judy's complaint and action with prejudice. In all other respects the judgment is affirmed.

¶43. **AFFIRMED IN PART AND REVERSED AND RENDERED IN PART.**

**PITTMAN, C.J., BANKS AND McRAE, P.JJ., SMITH, MILLS, WALLER, COBB AND DIAZ, JJ., CONCUR.**