946 So.2d 426 (2006)
FAMILY DOLLAR STORES OF MISSISSIPPI, INC., Appellant/Cross-Appellee
v.
Charles N. MONTGOMERY, Jr. and Bowman Electric Services, Inc., Appellees/Cross-Appellants.
No. 2005-CA-00126-COA.
Court of Appeals of Mississippi.
December 12, 2006.
*428 Hugh Gillon, attorney for appellant.
Tim Waycaster, Richard D. Underwood, attorneys for appellees.
Before MYERS, P.J., SOUTHWICK and GRIFFIS, JJ.
SOUTHWICK, J., for the Court.
¶ 1. Patrons and employees of a Family Dollar store in Fayette, Mississippi brought suit for injuries sustained when the roof of the store partially collapsed during an expansion project. The personal injury claims were settled prior to trial. The remaining parties include the building owner, the contractor, and Family Dollar. The Jefferson County Circuit Court, after a bench trial, allocated fault to all defendants, refused to order the contractor to indemnify Family Dollar, and established the amount of damages. Family Dollar appeals on several issues, and the building owner cross-appeals on the amount of damages. We find error as to the basis on which Family Dollar was found liable. We reverse and remand for further proceedings.

FACTS
¶ 2. Charles Montgomery Jr. owned a building in Fayette, Mississippi which he first leased to a Family Dollar corporate entity in 1982. The current lease is between Montgomery and Family Dollar Stores of Mississippi, Inc. The lease was amended in 1994 due to an anticipated expansion of the store. Family Dollar was to make the improvements at its own expense, in a workmanlike manner and in compliance with all applicable building codes.
¶ 3. In 2001, Family Dollar hired Bowman Electric Service, Inc. as the general contractor for the expansion. Bowman was not licensed as a general contractor. It had been thirty-five years since he had been involved with a project requiring removal of a load-bearing wall. Bowman subcontracted certain work to Will T. Turner, including removal of a load-bearing wall. On May 21, 2001, Turner was in the process of removing that wall when the roof of the building partially collapsed. The store was open for business when this accident occurred. Patrons and employees who were in the store at the time of the accident alleged personal injuries. Family Dollar settled all of the personal injury claims that had been filed and took an assignment of the claims that it had settled.
*429 ¶ 4. Montgomery brought suit for breach of contract against Family Dollar, and a negligence claim against the contractor Bowman. Family Dollar cross-claimed against Bowman for indemnity and counter-claimed against Montgomery on the assigned personal injury claims.
¶ 5. The court found that the roof collapsed because inadequate supports were utilized while removing the load-bearing wall. Montgomery was awarded a total of $211,786.28 in damages and was not apportioned any liability. Liability for all the damages was apportioned as follows: Family Dollar fifty-percent, Bowman thirty-percent, and Turner twenty-percent.
¶ 6. Only Family Dollar and Montgomery appeal to seek reversal of parts of the judgment.

DISCUSSION
¶ 7. The findings of a court conducting a bench trial are given the same deference that a chancellor receives; those findings will not be disturbed when supported by "substantial, credible, and reasonable evidence." City of Jackson v. Brister, 838 So.2d 274, 278 (Miss.2003). Questions of law are reviewed de novo. Donald v. Amoco Prod. Co., 735 So.2d 161, 165 (Miss.1999).
1. Apportionment of Fault to Family Dollar
¶ 8. The court allocated half the fault for the damages to Family Dollar. One of the reasons was that Family Dollar provided the "Scope of Work" to be performed under the contract with Bowman. More importantly to the court, the liability arose from a contract between Family Dollar and the contractor, Montgomery. In the form contract, a blank for designating an architect was completed by identifying Family Dollar as filling that role. There was no description of the architect's duties. The court accepted expert opinion that Family Dollar as the designated architect breached its implied duties by failing to advise the contractors concerning the temporary shoring of the structure.
¶ 9. Family Dollar did not offer any expert testimony indicating a more limited set of duties for an architect. Instead, it argued that the form contract had been improperly completed and that the entry for an architect should have been left blank. Family Dollar argues that neither itself nor Bowman intended for there to be an architect on the project. There was substantial evidence on which Montgomery relies that Family Dollar ignored its responsibilities as an architect. Family Dollar points to the same evidence as support for the parties' understanding that there was no architect. Further, Family Dollar argues that since the contract provided no duties for whomever was named architect, expert testimony as to an architect's general responsibilities could not import such duties into the silent contract.
¶ 10. It is a question of fact of whether Family Dollar was identified as the architect in this contract simply as a mistake when the form was being completed. Family Dollar made that argument, but the trial court never addressed it. Instead, the court in its findings recited the expert's opinion that an architect should advise a contractor on the suitability of removing a load-bearing wall. The argument that Family Dollar was making is that there never was an intent to have an architect, that none was used, and that naming Family Dollar as the architect was the result of a mutual mistake. That the clear language of a contract does not accurately reflect the intentions of the parties is a proper issue for consideration. Dunn v. Dunn, 786 So.2d 1045, 1050 (Miss.2001).
*430 ¶ 11. A different and largely unrelated problem with the trial court's decision is that it imposed general, non-contractual duties on Family Dollar simply because the contract identified it as the architect. There was evidence that the complete form from which the contract was derived has other pages describing an architect's duties, but those were not included with what was executed. The word "architect" appears in the executed contract only twice. One is on the cover sheet, which had blanks for designating the parties. The other is in the attachment entitled "Scope of Work," in which Family Dollar required that the plans be sent to its architect in North Carolina. Duties of the contractor and owner are described throughout the contract, but there is no other mention of an architect.
¶ 12. Accepting for purposes of analysis that Family Dollar was the architect, we evaluate as a question of law the trial court's decision to import duties for an architect into a contract that is silent about the duties. Engineers and architects are held to a duty to "exercise ordinary professional skill and diligence," duties usually controlled by the contracts between the parties. Hobson v. Waggoner Engineering, Inc., 878 So.2d 68, 77 (Miss. Ct.App.2003). Only in limited circumstances will architects, independently of express contract language, have "a duty to supervise the construction site to ensure safe operations." Id. at 71-72. "Unless the architect has undertaken by conduct or contract to supervise a construction project, he is under no duty to notify or warn workers or employees of the contractor or subcontractor of hazardous conditions on the construction site." Jones v. James Reeves Contractors, 701 So.2d 774, 786 (Miss.1997).
¶ 13. The trial court found Family Dollar liable because as architect it should have been on the scene to advise the contractor on the temporary shoring while the load-bearing wall was being removed. An office of Family Dollar in North Carolina was to be sent the plans, but there is no suggestion that the corporate architect supervised work or that the plans it was to be sent referred to temporary construction measures. Most importantly, the contract contained no language describing any duties for Family Dollar as architect. Absent a contractual duty such as to supervise the project, there can be no assignment to the architect of the James Reevesstyle duty of warning about hazardous conditions, which temporary measures during removal of load-bearing wall proved to be.
¶ 14. Regardless of the answer to the unresolved question of whether naming Family Dollar as the architect in the construction project was a mutual mistake, even as architect, Family Dollar would not have had the duty that is the basis for the liability assigned to it. Consequently, the construction contract was an improper source for liability.
¶ 15. There was a second contract argued below as creating obligations on Family Dollar that it did not fulfill. The court found that Family Dollar had duties relevant to this litigation based upon its lease. The 1982 lease gave Family Dollar the right to make alterations to the premises, but it had to acquire Montgomery's consent to make "structural changes," consent that was not to be withheld unreasonably. Montgomery presented evidence that he objected to the removal of the load-bearing wall, though the trial judge did not rely on that alleged refusal. Under the 1994 amendment to the lease, which contemplated the expansion of the store into the entirety of Montgomery's building, Family Dollar was given the right to make "improvements and alterations" to *431 combine the newly leased space with the existing store. The "work performed by [Family Dollar] shall be done in a workmanlike manner and in compliance with all applicable building codes." It is unclear whether this amendment should be interpreted to have removed the requirement of obtaining the permission of the owner to make structural changes, as the earlier lease terms were continued only to the extent they were not modified by the amendment.
¶ 16. The trial court did not accept that the lease made Family Dollar totally responsible to the landlord for the damage, with Family Dollar then potentially having a right of indemnity. Instead, the court held that the contractor was responsible for the damage because of his oversight duties. The subcontractor who actually removed the load-bearing wall also was liable. Family Dollar was found to be responsible as the architect, a conclusion we have rejected. The court noted Family Dollar also had duties under the lease to assure that renovations were completed in a workmanlike manner, and the court found that Family Dollar had chosen to perform those responsibilities as the architect. By merging the lease responsibilities with the perceived architect duties, the trial court never determined whether Family Dollar strictly as a lessee had breached its obligation to its landlord that the alterations be made in a workmanlike manner and in compliance with all applicable building codes.
¶ 17. To understand what duties Family Dollar as lessee might have had, we examine Montgomery's argument. He asserted that Family Dollar breached its contractual duties as lessee by hiring an electrical contractor as the general contractor, failing to inquire concerning licensing and qualifications of Bowman and subcontractors, not being diligent in the oversight of the project, and by failing to provide engineering expertise or plans and specifications. Some of those arguments better fit claims against Family Dollar as alleged architect, but at least the hiring of a potentially unqualified general contractor is a legitimate basis to argue a breach of the lease.
¶ 18. We conclude that Family Dollar's possible breach of the lease is an issue for remand to the trial court. On remand, the court should consider as fact-finder the evidence that has already been presented and additional evidence if in its discretion a new evidentiary hearing is needed. The legal issue against which that evidence is to be tested is whether Family Dollar breached its obligations strictly as lessee such as to assure that improvements to the property were performed in a workmanlike manner. No duties of an architect should be entangled with the duties under the lease.
¶ 19. Also an issue on appeal is whether the absence of a specific negligence claim against Family Dollar in the complaint prevented it from being assigned any fault in the accident. A motion to amend was discussed, but the trial judge found no need for an explicit claim of negligence. The court found that proof of negligent performance of Family Dollar's duties as architect or under the lease would support liability on the complaint as written.
¶ 20. On appeal, Family Dollar argues that it cannot be assigned comparative fault unless it is considered a "tortfeasor" as opposed to a breaker of contracts. A statute defines comparative fault as "an act or omission of a person which is a proximate cause of injury" to another, "including, but not limited to, negligence, malpractice, strict liability, absolute liability or failure to warn." Miss.Code Ann. § 85-5-7 (Supp.2006). This statutory list indicates by the word "including" that it is *432 non-exclusive. A dissenting justice on the Supreme Court once enlarged the list in arguing that the statute was unconstitutional since it required a court "to instruct a jury to bring in all of the players involved with the elements of absolute liability, strict liability, negligence, failure to warn, and breach of contract." Estate of Hunter v. Gen. Motors Corp., 729 So.2d 1264, 1282 (Miss.1999) (McRae, J, dissenting). The court majority obviously did not agree with the basic dissent argument and may not have agreed with the adding of contract breaches to the reach of the statute.
¶ 21. Family Dollar cites one of our cases as support for the argument that it is improper to mix contract breaches with torts to form comparative fault. Capital City Ins. Co. v. Ringgold Timber Co., Inc., 898 So.2d 680 (Miss.Ct.App.2004), cert. denied, 898 So.2d 679 (Miss.2005). This court held that when an insurance company was joined in a case solely on the issue of whether its policy covered the improper timber cutting, it could not be found a joint tortfeasor with those who had illegally cut the timber. Id. at 683. No claim had been made against the insurance company that it "played a role in the overcut of timber" by the other defendants. Id. By making it a joint tortfeasor, the trial court expanded the insurance company's liability beyond its policy limits. We did not analyze whether those who breached a contract could never be joined in an allocation of fault with those who committed torts.
¶ 22. In some cases, the breach of contract obligations in combination with the negligence of others might join to form a common injury. Yet if one party's contribution to damage is passive, such as creating the conditions, while other parties are the active agents of harm, that is a situation in which the contribution to the harm is not joint. Long Term Care, Inc. v. Jesco, Inc., 560 So.2d 717, 721 (Miss. 1990). If assuring a workmanlike performance during renovations did not require Family Dollar to participate actively in the construction, such as by supervision, it might not be a joint-tortfeasor with those who were working on the renovations. If Family Dollar breached the lease but was not a joint tortfeasor, it may be entitled to indemnification. Id.
2. Indemnity
¶ 23. Family Dollar argues that the trial court erred in denying its indemnity claim against Bowman. Family Dollar asserts that the construction contract placed all risk on Bowman and required Bowman to deliver a completed project. Completion would require that the renovated building comply with all building codes. The contract was a "turnkey" project, which was identified below as a project in which Bowman completed the work and turned it over, at least figuratively with the key, to Family Dollar.
¶ 24. The trial court denied indemnity because non-contractual indemnity does not arise if the entity to be indemnified participated actively in the wrong. Hartford Cas. Ins. Co. v. Halliburton Co., 826 So.2d 1206, 1216 (Miss.2001). Even had there been an indemnity clause, an express provision in a construction contract to indemnify a party from its own negligence is not enforceable. Miss.Code Ann. § 31-5-41 (Supp.2006). Applying that principle, the court held that Family Dollar's negligent performance of its duties in supervising the project as architect made it ineligible for indemnity. Since we have reversed the finding regarding an architect's duties and remanded for further proceedings, we now also reverse the denial of indemnity. This issue should be reconsidered in light of the conclusions that must be reached as to whether Family *433 Dollar failed to sustain its duties as lessee.
3. Post-Judgment Motions
¶ 25. Family Dollar's motions to amend the judgment and for a new trial were denied. Since we are reversing, Family Dollar's appellate arguments as to the denial of these motions are moot.

CROSS-APPEAL
1. Apportionment of Fault to Turner
¶ 26. Montgomery argues that fault should not have been apportioned to Turner, the subcontractor who removed the load-bearing wall. Turner is not a party to this litigation. Though a non-party, Turner was allocated twenty-percent of the fault for the accident. Assigning fault to participants in an injury who are absent from the litigation is proper. Estate of Hunter, 729 So.2d at 1276.
¶ 27. Montgomery submits that Family Dollar and Bowman were fully responsible for the accident because Turner relied on the instruction of Family Dollar and Bowman to remove the wall. Turner could reasonably assume that both parties, because of their experience in such projects, had done the proper engineering to ensure the safe removal of the wall. Montgomery argues that Turner thought his plan for removing the wall was appropriate because Family Dollar's project manager and Bowman reviewed and did not question Turner's plan for bracing the roof.
¶ 28. Apportionment of fault among potential joint tortfeasors is a question of fact. City of Ellisville v. Richardson, 913 So.2d 973, 980 (Miss.2005); Miss. Code Ann. § 85-5-7 (Supp.2005). There was evidence that Turner employees were the only individuals working on the renovation project when the roof collapsed. The trial court found that the roof collapsed due to inadequate supports being utilized during the removal of the load-bearing wall. The trial court found that Turner was responsible for removal of the load-bearing wall and was the party that actually positioned the roof supports in the process of removing the wall. The court determined that Turner was principally responsible for the roof collapse. This finding is supported by the record.
2. Building Valuation
¶ 29. The court awarded Montgomery damages based upon the physical damage to the building and the loss of income derived from the lease with Family Dollar. The court concluded the lease would have expired twenty-nine months after the roof collapse, and it was too speculative to award damages on the assumption that the lease would have been renewed at that time. Therefore, the award was the difference between the fair market value of the building before and after the damage, and rent for the remainder of the then-current term of the lease.
¶ 30. The general measure of damages for permanent injury to land that does not involve willful trespass is the difference between the value of the property before the damage and the value afterwards. Harrison v. McMillan, 828 So.2d 756, 769 (Miss.2002). If the repair cost is less than the post-damage value of the property, an alternative measure for damages is the repair cost plus compensation for the lost use. Id. Appraising the before-damage value should consider three methods of valuation: the income approach, cost approach, and market data/sales comparison approach. Crocker v. Miss. State Highway Comm'n, 534 So.2d 549, 553 (Miss.1988). Although not required in every appraisal, in the context of *434 determining the value of commercial property, "all three methods of valuation could be relevant and useful and, at a minimum, should be considered." Eller Media v. Miss. Transp. Comm'n, 882 So.2d 198, 203 (Miss.2004)
¶ 31. The court was presented with different estimates of value and costs of repair. Family Dollar's expert, Willie Hill, appraised the property at $235,000 prior to being damaged. Hill testified that the salvage value of the building in the collapsed condition was $89,000. Hill's appraisal was the result of the cost approach and an examination of comparable sales. Hill stated in his report that he did not think a valuation based on the property's income was applicable because the building was collapsed and could not produce income. Family Dollar also provided the testimony of builder Dennis Allred that the cost of repair was $156,000. Montgomery offered the testimony of Richard Edgin concerning the salvage value and cost of repair. Edgin testified that the building had no salvage value because the cost of getting materials from the destroyed structure was more than the materials were worth. He also testified that the cost of repair would be $369,000.
¶ 32. Montgomery did not offer the same kind of valuation as did Family Dollar. Instead, he presented the testimony of Bill Rush Mosby, a certified public accountant. Mosby testified that the value of the income stream of the property was $453,698.50. Mosby calculated fair market value by dividing the net rent (gross rent less the taxes the landlord paid) that Montgomery received per year by a six percent capitalization rate. This income-approach valuation was based on the past income performance. Mosby apparently assumed that the lease would continue indefinitely. His testimony relied upon a set capitalization rate that Family Dollar argues was unusual and erroneous. Also argued below was that the capitalization rate used to value property should vary depending on the area in which the property is located, which could result in a much lower estimate of the property's value than Mosby gave. The credibility of Mosby's valuation was diminished by his admission that he did not look at the lease and never considered the local real estate market.
¶ 33. Two critical components of the trial court's valuation of the lease were that the lease had less than three years until it expired and would need to be renewed, and that the tenant had the right to terminate on sixty-days notice. The court found that it was not overly speculative to assume that Family Dollar would have continued the lease until the end of the lease term in December 2003, but the court would not base value on an assumption that the lease would be renewed thereafter. Family Dollar had multiple options to renew the lease for an additional twenty years after the current lease expired. The court awarded damages for Montgomery's loss of income by multiplying the monthly rent by the twenty-nine months that had been left in the lease term, then deducting the property taxes that Montgomery would pay. Awarded as lost income was $65,786.28.
¶ 34. The court adopted the salvage value figure provided by Hill as reliable because Hill was a certified appraiser and explained the method by which the value was determined. Edgin provided no basis for his salvage value calculation. The court found that Edgin provided a more accurate repair cost because it was the product of a thorough review of the property. Family Dollar's expert did not provide a price breakdown of the costs. Since the court-accepted estimates of repair costs were higher than the value of the *435 building, the court determined that the property was a total loss and that Montgomery was entitled to $146,000 for the loss of value of the property.
¶ 35. Damages relating to a contract that is terminable at-will is a factual issue to be determined by the fact-finder. The damages awarded should place Montgomery in the position he would have been in but for the breach of his contract. Frierson v. Delta Outdoor, Inc., 794 So.2d 220, 225 (Miss.2001). Montgomery argues that Willie Hill, Family Dollar's appraiser, erred in using a sale comparison approach and not an income stream approach. Beginning with the 1982 lease, Family Dollar had continuously occupied part of the building and was expanding to occupy the remainder when the damage occurred. Considerable sums of money were being expended to improve the store, a far greater investment than just occupying the building for another twenty-nine months might have justified. Far from being too speculative to consider that the lease would be renewed, Montgomery argues it was too short-sighted to calculate on the basis that the lease would end in 2003. Montgomery argues that his evidence at trial, which assigned a higher before-damage market value, supported the conclusion that the building was only a partial loss and should be repaired.
¶ 36. There were arguments below and here regarding the market conditions in the location of this business, and whether the value accepted for the premises before the damage properly took into account its income-producing record and potential. We find no error in the trial court's basic approach to assign a value that represents what the property was worth before the damage, which would include the value not just of an empty building but of rented property with good prospects for continued renting. An offsetting value is what the property was worth after the damage, including whether the costs of repairs are too great compared to the value of the building.
¶ 37. There are several recognized methods of valuing business property. The trial court chose among those upon which evidence was offered. The goal in this part of the litigation was to determine the value of what Montgomery had before the damage and to place him back in that position. Total damages were awarded to Montgomery by considering various methods of appraisal. We find no fundamental error in the choices that the trial court made. We also conclude that a large amount of discretion was applied. Since we are reversing the judgment, the decision on damages may be reconsidered before a new final judgment is entered. Should the trial court continue to consider its prior conclusions as to damages correct, we find that to be sustainable. Should in the course of reconsidering the issues directed to him on the remand, further evaluation of the damage award appears in order, that is proper as well.
¶ 38. THE JUDGMENT OF THE JEFFERSON COUNTY CIRCUIT COURT IS REVERSED ON APPEAL, AFFIRMED ON CROSS-APPEAL, AND THE CAUSE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS OF THIS APPEAL ARE ASSESSED EQUALLY TO THE APPELLANT AND TO THE APPELLEES.
KING, C.J., LEE AND MYERS, P.JJ., CHANDLER, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR. IRVING, J., NOT PARTICIPATING.